## SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | 1501 K STREET, N.W. | LOS ANGELES |
| BRUSSELS | WASHINGTON, D.C. 20005 | NEW YORK |
| CHICAGO | TELEPHONE 202 736 8000 | SAN FRANCISCO |
| DALLAS | FACSIMILE 202 736 8711 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | | WASHINGTON, D.C. |

WRITER'S DIRECT NUMBER
(202) 736-8291

WRITER'S E-MAIL ADDRESS
jgreen@sidley.com

August 2, 2005

**By Electronic Mail**
**Hard Copy to Follow**

Mr. Stevan Bunnell, Esq.
Chief, Criminal Division
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

　　　　　Re:　　Andrea Grimsley

Dear Steve:

　　　　　We appreciate your taking time to hear from us in this important matter. In order to assist in your review, we provide the following brief description of the current investigation and our position in it. While we have had helpful discussions with Ms. Merola and Mr. Roth, we have several issues we feel are important to bring to your level. Ms. Grimsley is 57 years old, a recent widow and was a loyal employee of the Immigrations Customs Enforcement Division ("ICE") of the Department of Homeland Security and its predecessor organizations for 30 years prior to her retirement at the end of January 2004. She had an unblemished record of diligent, faithful and exemplary performance in very trying circumstances, especially in her last few years of service when ICE was significantly understaffed in performing its contracting responsibilities.

　　　　　The facts we will unfold here (which are largely undisputed as to the core issues) do not tell a tale of dissemblance, malfeasance or greed. Nor has any claim ever been made in these proceedings that the United States has paid $1 more than it should have or that Ms. Grimsley's actions have otherwise harmed its interests. Instead, these circumstances describe the actions of an individual who was not as cautious as she should have been as she undertook the one-time transition from her long government service to private sector employment.

### The Threatened Charge

　　　　　Ms. Grimsley is accused of violating 18 USC § 208(a) by substantially participating in a matter in which she, and a company in which she had a financial interest, were

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 2

involved. The "matter" was the preparation of an RFI (request for information) – a precursor to an RFP (request for proposal) – seeking information from manufacturers of handguns that the Department of Homeland Security would later purchase for several of its agencies. For shorthand purposes, we refer to the matter as the "Pistol Contract." The company in which Ms. Grimsley had a financial interest was called "FEDBID." FEDBID was not a prospective bidder for the Pistol Contract; instead it is a reverse auction website, through which prospective bidders (in this case, the gun manufacturers) would submit bids. Within the framework of a Government acquisition, the use of FEDBID as a reverse auction tool has no impact on what the vendors bid or which bidder wins the contract. Its use is much like using any software or other evaluation tool that is assigned to ease the burden on the Contracting Officer. The cost of the service is imbedded in a vendors bid and paid by the winning bidder if a contract is awarded.[1]

At the suggestion and instigation of the Procurement Office Director, Mr. Mario Cadori, the office and Ms. Grimsley had begun using FEDBID for other procurements in the months leading up to discussions regarding the Pistol Contract. FEDBID was perceived by Mr. Cadori and Ms. Grimsley to be an excellent tool for commodity-type purchases and a means to relieve the heavily over-burdened staff. In fact, FEDBID is now the official reverse auction tool used by the Procurement Office.

Ms. Grimsley's retirement date was January 31, 2004. Ms. Grimsley began negotiating employment with FEDBID at the end of November 2003. Ultimately, she accepted employment with FEDBID on January 16, 2004. On December 1, 2003, Ms. Grimsley had notified the Procurement Office Ethics Officer of her intent to pursue employment opportunities with FEDBID and other companies.

The heart of the allegations against Ms. Grimsley is that Ms. Grimsley violated § 208 by participating in meetings regarding the Pistol Contract and actively endorsing the use of FEDBID after her December 1, 2003 notice to the Ethics Officer. In particular, Ms. Grimsley attended a January 6, 2004 meeting in Altoona at National Firearms Tactical Training Unit ("NFTTU") offices, during which the Pistol Contract was discussed. Following that meeting, Ms. Grimsley participated in two Commodity Council conference calls where the Pistol Contract was one of the subjects discussed. Ms. Grimsley is also accused of directing her subordinate, in

---

[1] The use of FEDBID in any particular procurement will never influence the Government's award decision as the Government is always the final arbiter as to whether to accept a bid or not. If the bid to the Government, which includes the FEDBID service fee, does not show a savings to the Government, or adequate competition, no award is made. The maximum fee FEDBID charges does not exceed $10,000 for its services.

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 3

January 2004, to use FEDBID in the Pistol Contract bidding process. These actions are alleged to have directly benefited FEDBID and to constitute a *per se* criminal violation of § 208.

### Our Position

We have long-pointed to a fact raised forcefully and repeatedly by our client, even in her initial interviews with Special Agent Dawson: Mr. Cadori, the Procurement Office Director and Ms. Grimsley had agreed – *before Ms. Grimsley's financial interest in FEDBID arose* – that FEDBID should be used for the Pistol Contract. We do not contend that this particular fact is undisputed. Mr. Cadori's initial statements to Agent Dawson were equivocal and his recollection is not crystal clear. We strongly believe, however, that the objective facts demonstrate that the seminal conversations between Mr. Cadori and Ms. Grimsley occurred prior to her December 1, 2003 notice to the Ethics Officer.

First, Mr. Cadori and Ms. Grimsley spoke on a daily basis. Second, both acknowledge that, long before December 1, 2003, the issue of NFTTU contracts returning to Mr. Cardori's office for procurement activities was likely, that it was a substantial burden on an already severely understaffed operation, and that they discussed the use of FEDBID to help relieve this burden. Third, based upon dates that NFTTU officials called and met Mr. Cadori about the Pistol Contract, we are confident that the conversation in which Mr. Cadori "concurred" with Ms. Grimsley's suggestion to use FEDBID for the Pistol Contract itself occurred, at the very latest, in the week prior to the December 1, 2003 e-mail. Moreover, two corollary facts *are* undisputed: (1) Although numerous contracts were awarded by Ms. Grimsley's branch every month for multiple Government customers in ICE, not just NFTTU, Ms. Grimsley did not require the use of FEDBID for these additional contracts; and (2) after December 1, 2003, Ms. Grimsley did not involve herself in other contracts where FEDBID was to be used, nor did she select any other commodity requirement for solicitation through FEDBID. This supports her claim that she considered the decision to use FEDBID on the Pistol Contract to have pre-dated her financial interest.

Ms. Merola and Mr. Roth have pointed out that even assuming our position on these points are meritorious, they do not absolve Ms. Grimsley of criminal liability because the mens rea element for a violation is reduced and, arguably, non-existent for a misdemeanor (which is the charge contained in the plea offer). As Mr. Roth succinctly put it: "Given the way § 208 is structured, we don't have to worry about these intent issues." While we agree that this may be true for the proffered misdemeanor, we disagree strongly that it is so for the felony.

Assuming that Ms. Grimsley would be charged with the felony if she refuses the misdemeanor plea, caselaw supports our position that proof of mens rea is required. *See United*

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 4

States v. Nofziger, 878 F.2d 442 (D.C. Cir. 1989) (interpreting language in § 207 identical to that in § 208). Moreover, the types of justifications supporting a reduced mens rea standard for "public welfare" statutes are a poor fit here. There is a distinct difference between the "public welfare" and the "public fisk." "Public welfare" arguments have greatest persuasive power in situations where irreparable harm may occur (e.g., to the environment) from the failure of self-reporting systems.

Here, however, this is not an event (retirement) capable of frequent repetition, nor is there even potential for greater harm aside from speculative contentions that the Government might have overpaid or that the source selection process might have been compromised.[2] Further, in this case the particular conflict was not at all obvious. Ms. Grimsley was not going to work for one of the competing gun manufacturers that had a direct and plain interest in the Pistol Contract; instead she was going to work for a company that facilitated commodity buys by the Government. We do not see this case as materially different from an instance in which Ms. Grimsley participated in a live auction conducted on an AT&T conference call bridge when she was going to go to work for AT&T. We can find no reported cases where the use of a tool like FEDBID as an evaluation aid to Government employees formed a basis for a violation of § 208. And finally, there was obviously nothing wrong with, or second rate, about FEDBID. In 2004 after Ms. Grimsley's retirement, and apparently as a result of the complaints that initiated this investigation,[3] the Procurement Office conducted an independent competitive review process for reverse auction web-site providers. FEDBID was chosen as the best provider. Accordingly,

---

[2] Corruption and outright fraud might stem from conflict of interest situations (payments to Government officials, lax oversight), but these are prosecuted under other statutes to which no reduced mens rea standard applies. Mr. Roth has noted that a bribery prosecution might not be out of the question here, because (as he theorizes) Ms. Grimsley received a benefit (the promise of a job), that was corruptly offered by a party with a financial interest. Aside from the obvious litigation risk of involving a second defendant or third party that would be necessary to prove such a case, the conversations between Mr. Cadori and Ms. Grimsley about using FEDBID for National Firearms Unit contracting generally, and for the Pistol Contract specifically, fully negate any assertion that FEDBID's later promise of employment was a *quid pro quo* for her participation in the Pistol Contract.

[3] Our understanding is that the complainant was a former co-worker who had long-standing "conflicts" with Ms. Grimsley throughout her years in that office. We also believe that the complainant authored an anonymous e-mail to Ms. Grimsley's new employers making plainly false personal attacks, decrying her ethics and suggesting she be terminated. While the source of a complaint does not always detract from the merit of that complaint, it might be considered important to the question of whether an alternative disposition, other than a plea, is appropriate.

SIDLEY AUSTIN BROWN & WOOD LLP               WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 5

given the nature of the facts here, reliance on "public welfare" arguments to justify a decision to prosecute is misplaced.

The remaining question is why Ms. Grimsley is reluctant to take the proffered misdemeanor plea, in support of which the prosecution would only have to show (according to Ms. Merola and Mr. Roth) that Ms. Grimsley acted in a position of conflict, not that she intended to or even understood that she was doing so. Ms. Grimsley's reluctance stems form the fact that her motives in acting in the manner she did had nothing to do with advancing her interest in FEDBID. Ms. Grimsley went to the January 6, 2004 NFTTU meeting in her native Altoona, Pennsylvania because she wanted to visit her family, not because she wanted to advance FEDBID's interests. It was not at all unusual for Ms. Grimsley to attend meetings at the NFTTU in Altoona. On another occasion, Ms. Grimsley spent 3 days in Altoona working with program offices at the NFTTU, assisting them in writing the specifications for a new body armor contract. She repeatedly participated in these types of meetings to assist program offices in order to move the acquisition process along. She was also undisputedly the most capable person in her office to put this troubled acquisition on the right track. When asked about FEDBID at the Altoona meeting, she did not demure, she said it was a "great tool." But her presence was the result of a different kind of opportunism: she wanted to see her family. She has said this from the outset and it was well known to her office, to those in attendance at the meeting, and the Contract Specialist who accompanied her to this meeting.

Ms. Grimsley's subsequent participation in Commodity Council conference calls, wherein the Pistol Contract was a subject, stemmed from a higher motive. There she felt obligated to continue to work with the program offices to ensure that the scheduling of testing, evaluations and specification modification was sufficient to ensure that the pistols were purchased in a timely and successful manner.[4] Although Ms. Grimsley was attempting to complete and transition actions prior to her retirement, she participated in these meetings, telephonically, in order to make sure that preparations for the contract went smoothly. Ms. Wisor, who was to be the Contracting Officer when the pistol requirement was to be officially received and solicited, and others in the organization readily stated that this was Ms. Grimsley's strongest area of expertise. Thus, Ms. Grimsley participated to help those who wanted and needed the Pistol Contract to be a success, not to promote FEDBID.

Because these were her motives, and because the investigator has never seriously challenged them with contrary facts, we are reluctant to accede to a demand that Ms. Grimsley

---

[4] The Pistol Contract was politically sensitive and the source of considerable urgency, given that it had been transferred to the ICE Procurement Office from another DHS office and that it was the subject of complaints from involved-agency officials because of the delays.

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 6

plead guilty to the most legalistic reading of the statute. The D.C. Circuit rejected such a legalistic approach in *Nofziger*, 878 F.2d 442, an Ethics in Government Act case involving 18 USC §207, holding that courts should presume mens rea is required in a criminal case. The court in *Nofziger* provides a thoughtful discussion of not criminalizing, as a public welfare measure, apparently innocent conduct. Nevertheless, understanding the realities of what Ms. Merola and Mr. Roth point out about the misdemeanor provision and the significantly different "public welfare" considerations that context, we have proposed an alternative disposition.

### Our Proposal

As the central provision of a non-prosecution agreement, Ms. Grimsley will appear at ICE ethics trainings to describe and narrate her lapse of judgment in taking part in the post-December 1, 2003 meetings involving the Pistol Contract. She would be available to ICE ethics officials as part of their training program to indicate, in real life, how a loyal, competent, and dedicated employee can run afoul of ethics laws and regulations with its concomitant adverse implications on one's life, reputation and mental well being. The ICE Ethics Officer with whom we have had exploratory discussions on this approach was favorably inclined to use Ms. Grimsley as a "training tool." The new Director of the ICE Procurement Office and the ICE Procurement Attorney concur in this proposal. Other provisions of Ms. Grimsley's non-prosecution agreement would include educational courses and the payment of some costs to allay the costs of investigation.

\* \* \*

Public and legal press reports indicate that the United States Attorneys are being urged to take a hard-line on conflicts cases in an era of gross contracting fraud attendant to the letting of tens of billions of dollars in contracts to support our War on Terrorism. Yet this is not one of those cases, nor will it set any sort of precedent given its unique facts. Ms. Grimsley does not ask to be "let go" – she has offered to help in a way that will offer much greater deterrence to persons in her peculiar circumstances that a misdemeanor conviction ever will. For these reasons, we ask that you hear us further on a possible alternative disposition in this case.

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.

Mr. Stevan Bunnell
August 2, 2005
Page 7

Sincerely,

Jeffrey Green
Harvey Nathan

cc:   John Roth
      Michelle Merola

SIDLEY AUSTIN BROWN & WOOD LLP                    WASHINGTON, D.C.